THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| HILDA SOLIS, Secretary of Labor, United States Department of Labor<br><br>Plaintiff,<br><br>vs.<br><br>CONSOLIDATED GUN RANGES and N. BRIAN HALLAQ,<br><br>Defendants. | No.  C10-338Z<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

THIS MATTER came on for trial on March 14, 2011, before the Court, sitting without a jury.  Plaintiff was represented by Bruce Brown and Donna Bond of the Office of the Solicitor of the United States Department of Labor.  Defendants Consolidated Gun Ranges, LLC ("CGR") and N. Brian Hallaq were represented by Jeffrey Youmans and Courtney Mertes of Davis Wright Tremaine, LLP.  At the conclusion of trial the Court took the matter under advisement.  The Court has now considered the testimony presented at trial, the exhibits admitted into evidence, and the

arguments of counsel.  The Court being fully advised, now makes the following Findings of Fact and Conclusions of Law:

## I. FINDINGS OF FACT

1. At all times material, CGR has operated an indoor shooting range in Arlington, Washington, known as the Norpoint Shooting and Tactical Training Center ("Norpoint").  CGR owns a seventy percent majority stake in Norpoint, while the remaining thirty percent interest is owned by Michael Skladany.

2. CGR's sole member is Enigma Investments, LLC, a holding company owned by Jan Gossing and defendant N. Brian Hallaq.[1]

3. CGR is an employer subject to the requirements of the Occupational Safety and Health Act ("OSHA"), 29 U.S.C. §§ 651 et seq.  Pretrial Order, Admitted Fact No. 2, docket no. 35.

4. In late 2007, CGR decided to hire a general manager for Norpoint to provide full-time, on-site management of the range.  CGR initially offered the position to Andrew Bates, but he declined.  Thereafter, in November 2007, CGR hired Heath Gunns to be the general manager.  Gunns held the position until September 22, 2008, when defendants terminated Gunns' employment.  Pretrial Order, Admitted Fact Nos. 3, 5, docket no. 35.

5. Although Gunns had never managed a gun range before, Hallaq and Gossing were initially satisfied with Gunns' performance as general manager.

---

[1] In approximately February 2010, Hallaq was divested of his ownership interest in CGR pursuant to the terms of the LLC agreement.

Beginning in at least June 2008, however, Hallaq and Gossing became dissatisfied with Gunns' performance for a variety of reasons, including a lack of attendance and presence at the range, poor business decisions, inadequate supervision of staff and customers, lack of professed business contacts and industry connections, personality and attitude problems, and a general failure to consistently provide professional oversight at the range.  <u>See</u> Exs. 11, A-7, A-11 to A-14, A-35, A-36, and A-58.  Prior to his termination, Hallaq and Gossing spoke with Gunns repeatedly about their concerns and his need for improvement.  For example:

   a.   Sometime during June or July of 2008, Hallaq spoke with Gunns about his lack of respect for minority owner Michael Skladany, in particular relating to an incident in which Skladany visited Norpoint with banker and possible investor Matthew Feske.  Skladany testified that he was unhappy with Gunn's performance and complained to Hallaq and Gossing.  Hallaq then met with Gunns and informed him that CGR expected him to act professionally at all times, particularly in front of customers and Mr. Skladany, an owner of the business.

   b.   Hallaq and Gossing held a meeting with Gunns on or about June 30, 2008, to discuss his lack of attendance at the range, and his unwillingness to work more than one weekend per month, which were the busiest days at the range.  Gunns refused to comply with the requests of Hallaq and Gossing, and refused their suggestions that he use a timecard.  The meeting was heated and confrontational.

c.     On July 1, 2008, CGR hired Bates to manage the range's new retail gun shop at Norpoint. They directed him to report to Hallaq and Gossing rather than Gunns. Gunns knew that Bates was originally CGR's first choice for the general manager position, and Gunns was not happy about the decision to hire Bates. Gunns also believed that Bates should report to him, as general manager, and not to Hallaq and Gossing. From early July through September, Bates repeatedly complained to the owners about Gunns' interference with Bates' work as retail manager and generally disrespectful attitude. Hallaq and Gossing spoke with Gunns on several occasions to remind him not to interfere with Bates' work as manager of the retail gun shop.

d.     On or about July 5, 2008, CGR employee James Hickey moved a large cabinet from a back storage area to the front part of the range, an area accessible by customers, for use in Norpoint's grand reopening. At some point, Gunns observed Gossing's pregnant wife leaning against the cabinet. Gunns believed that the cabinet was contaminated with lead dust, and informed Gossing and his wife of his concerns, but did not act to remove the cabinet immediately. Hallaq learned about the incident from Gossing, and immediately contacted Gunns and directed him to remove the cabinet. Hallaq believed that Gunns should have acted without the need for direction.

e.     Hallaq discussed two customer safety related incidents with Gunns in July 2008. Both incidents took place on weekends, when Gunns was not present, and Hallaq informed Gunns that it was his obligation to supervise employees

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4

and install policies at the range to be followed by all customers.  Gunns disputed that the incidents raised safety concerns, and refused to comply.

      f.      On August 1, 2008, Hallaq and Gossing set up a safety meeting at Norpoint for all employees, including Gunns.  That morning, Gunns sent an email indicating that he would be unable to attend the meeting due to severe traffic congestion.  Despite the traffic, however, other employees were able to be present for the meeting.  Hallaq again spoke with Gunns about his absences from the range, and the desire to have him work on-site more frequently.

      g.      Gunns' job performance continued to be poor in August and September 2008.  During that period, Gunns was absent from the range for several weeks, leaving it to Hallaq and Gossing to deal with the implementation of new safety procedures.  Hallaq and Gossing had to take substantial time off from their primary work as practicing attorneys to manage issues at Norpoint during Gunns' absences.

   6.      Hallaq voiced his dissatisfaction with Gunns, and his desire to replace him, with third parties on various occasions.  For example, on or about June 7-8, and again on August 3-4, 2008, Hallaq spoke with Nicholas Bolton, venting his frustrations with Gunns' performance.  In particular, Hallaq told Bolton of Gunns' lack of experience, lack of claimed industry connections, absences from the range, improper allocation of employee duty hours, and unsatisfactory management of the range.  Similarly, in late July 2008, a potential investor, Todd Heinreichs, told Hallaq that he was dissatisfied with Gunns' performance and that he would not invest in

Norpoint as long as the range continued to employ Gunns as the general manager. Hallaq responded that he was frustrated with Gunns, and that he did not believe that Gunns would be employed by the end of the year.

7.  On August 1, 2008, Hallaq prepared two draft emails that he proposed to send to Gunns and sent the emails to Gossing for his review. Exs. A-13 and A-14. In the emails, Hallaq advised Gunns about the owners' concerns and described ways that Gunns could improve his performance. After Gossing reviewed the emails, however, he convinced Hallaq that Gunns did not have a future with the company, and Hallaq decided not to send the emails to Gunns.

8.  Lead is a poisonous substance that can, depending on the exposure level, cause medical problems in varying degrees of severity, up to and including death. Lead poisoning is a risk specially associated with indoor gun ranges, due to the lead contained in bullets. Bullets striking targets at the end of the gun range often fragment, producing small quantities of lead particulate which can effect the health of individuals who inadvertently inhale or ingest sufficient quantities. See Ex. A-20. To protect against the adverse health consequences that can result from contact with the lead dust, employees wear protective equipment, and must ensure that the range is cleaned on a regular basis to eliminate the hazard for patrons, who may transfer lead dust to other areas via their hands, clothing, or the soles of their shoes.

9.  On August 7, 2008, blood test results for CGR employee James Hickey showed a blood lead level ("BLL") of 44 µg/dl. Ex. A-32. Under Washington

Department of Labor and Industry regulations, a BLL is considered "elevated" if it exceeds 25 µg/dl. Ex. 19. A BLL of 40 µg/dl is considered "serious," but not "actionable." Id. At 60 µg/dl, a BLL is "actionable," and state and federal law require an employer to remove the worker from the workplace. Id.; see also 29 C.F.R. § 1910.1025(k)(1)(i)(A).

  10. After learning of Hickey's test results, Gunns believed that the owners would blame him for Hickey's elevated BLL because he was responsible for implementing lead safety policies at the range, and he had trained Hickey and other employees on safety issues including the use of personal protective equipment ("PPE").

  11. On the evening of August 7, 2008, Gunns sent an email to Hallaq, Gossing, and Bates in which he described his concerns about an unidentified "lead problem" at Norpoint. Ex. A-17. Gunns. Id. The email contained a number of unsupported allegations, including Gunns' suggestion that Hallaq and Gossing had proposed that Gunns dispose of lead-contaminated furniture illegally, and Gunns' contention that the owners had failed to provide sufficient funds to clean up the lead hazard at Norpoint. Id. Gunns sent a blind copy of the email to his personal attorney.

  12. Hallaq and Gossing were furious with Gunns about the August 7, 2008 email, which they perceived as an effort to deflect blame for Hickey's elevated test results. Hallaq told DOL investigator McDevitt that, after receiving the email, he felt he could no longer work with Gunns.

13.     On August 8, 2008, Hallaq confronted Gunns about the email, and accused him of attempting to blackmail Norpoint's ownership in an effort to keep his job. Gunns responded to Hallaq, "Goddamn right it was." At that time, Gunns also suggested that CGR might want to replace him as the general manager of the range. Hallaq did not immediately terminate Gunns' employment, and instead requested that Gunns clarify the August 7 email accusation. Gunns sent another email on August 10, 2008, to clarify his email. Ex. A-21. The August 10 email retracted many of the allegations in Gunns' August 7, 2008 email. Id.

14.     Despite their anger with Gunns over the August 7, 2008 email, when notified of Hickey's elevated BLL test results, Hallaq and Gossing immediately took action to ensure that the range was safe and clean, requiring additional employee blood testing for lead levels, improving procedures for protecting employees from lead exposure, holding safety meetings with employees to go over those procedures and the use of PPE, and hiring an industrial hygiene firm to test the facility for lead. Exs. A-18 to A-20, and A-22 to A-34. The subsequent employee blood tests were all within normal limits.

15.     Hallaq's and Gossing's actions to remediate the lead problems at Norpoint were consistent with CGR's practices since taking over the range in 2007. The owners had previously delegated responsibility to Gunns to ensure that the range was thoroughly cleaned, to require employees to undergo blood testing for lead, to arrange and pay for employee medical evaluations, and to follow their HVAC

contractor's recommendations regarding the range's ventilation, filtration, and other safety systems. Exs. 1, 3, A-4.

16. Shortly after Gunns sent the August 7, 2008 email, Gunns, Hallaq, and Gossing learned that Hickey had stopped wearing his PPE when cleaning the range, which was likely the cause of his elevated BLL. At the direction of Hallaq and Gossing, Gunns sent Hickey a written reprimand for failing to comply with Norpoint's safety procedures. Ex. A-22.

17. After implementing changes to safety procedures and hiring outside parties to evaluate Norpoint for lead contamination, on September 22, 2008, CGR terminated Gunns' employment.[2]

18. On October 8, 2008, Gunns filed a whistleblower complaint with the Occupational Health and Safety Administration in Seattle (the "DOL complaint"). Ex. 8. The Department of Labor ("DOL") has statutory authority to investigate complaints under 29 U.S.C. § 660(c)(1) (also known as section 11(c)) and other whistleblower protection laws. Citing four environmental whistleblowing laws, the complaint alleged that CGR terminated Gunns' employment in retaliation for his August 7, 2008 email. Ex. 8. On October 20, DOL notified CGR of Gunns' complaint. Ex. A-39. DOL assigned investigator Paul McDevitt to the case. Id.

---

[2] CGR has not hired a replacement general manager for Norpoint since terminating Gunns' employment.

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 9

19.     Gunns' DOL complaint contains several false statements. For example, the complaint alleges:

> "[Hickey's] BLL was actionable under WAC, requiring medical evaluation and modified job duties. This prompted me to have all employees tested, and every employee, who had done a base line BLL, showed a substantial increase in BLL. I reported the elevated BLLs to my employers but without a satisfactory response."

Id. at 3. There are several false statements in this paragraph alone. First, although Hickey's BLL exceeded 40 µg/dl, which is classified as "serious" under Washington regulations, it was not "actionable," as Gunns alleged, because it did not exceed 60 µg/dl. See Exs. 19 and A-32. Moreover, it was Hallaq and Gossing, not Gunns, who immediately ordered employees to have their BLLs tested or retested. Ex. A-19 ("Effective immediately . . . all persons having an affiliation with Norpoint, including all owners, will need to have lead exposure tests performed as soon as can be scheduled."). Finally, Norpoint's owners did not ignore Gunns' email, as he suggests. To the contrary, they acted immediately, issuing a bulletin to all employees on August 8. Id. In the days following the August 7, 2008 email, Hallaq and Gossing instituted new policies, held workplace safety meetings with employees, hired outside firms to perform testing, and worked diligently to resolve any problem. See Exs. A-18 to A-20, A-24, A-26, A-28 to A-32, and A-34.

20.     The Court finds that Gunns sent the August 7, 2008 email in bad faith. Gunns believed he would be blamed for Hickey's test results, and he sent the email in a calculated attempt to save his job by deflecting responsibility for his own failures. Gunns sent the email in anticipation of filing a whistleblower complaint, sending a

blind copy of the email to his attorney, in an effort to secure an ownership interest in the range. See Ex. 8 at 6 (Gunns requested a five percent ownership interest in the range in the whistleblower complaint). On August 8, Gunns suggested to Hallaq that he should be replaced, in an apparent attempt to get Hallaq to terminate his employment. Gunns' bad faith is also evidenced by the email itself, and Gunns' subsequent complaint filed with DOL, both of which contain untrue or unsupported accusations. See Exs. 8 and A-21.

21. The Court further finds that CGR did not terminate Gunns' employment on September 22, 2008, because of his August 7, 2008 email. Rather, CGR terminated Gunns' employment because of his poor performance beginning in at least June 2008, for his lengthy absences from the range during August and September, and his continued poor performance as general manager. For example, following the August 7 email, Hallaq and Gossing spent considerable time implementing new lead safety policies, while Gunns was absent from the range for several weeks. See, e.g., Exs. A-33 and A-36. When he was present, Gunns continued to perform poorly. In early September, CGR's bank account was overdrawn when Gunns failed to timely deposit the range's weekend sales. A-35.

22. On October 30, 2008, Hallaq filed a defamation lawsuit in Pierce County Superior Court against Gunns, Hallaq v. Gunns, Pierce County Superior Court Cause No. 08-2-14062-3. Ex. 10. The suit alleged that Gunns had defamed Hallaq, who is a practicing attorney, by including a paragraph in his DOL complaint consisting of false

statements attacking Hallaq's professional ethics.  Id.  At the time of the filing, Hallaq was aware that Gunns had filed the DOL complaint.  The suit acknowledged that most of Gunns' DOL complaint was protected, but asserted that the single paragraph relating to Hallaq's professional ethics was not protected because it was unrelated to environmental issues and was knowingly false.

23. On November 13, 2008, Gunns filed a supplemental retaliation complaint with the DOL under the same environmental whistleblower protection statutes, alleging that Hallaq's defamation lawsuit was in retaliation for his October 10, 2008 complaint.  Ex. 12.

24. The state court dismissed Hallaq's lawsuit against Gunns with prejudice on summary judgment in September 2009, and the court awarded Gunns attorneys' fees, costs, and statutory damages under Washington's Anti-SLAPP law, RCW 4.24.510.  Exs. 16-17.  The state court did not rule on whether the defamation lawsuit amounted to retaliation under OSHA section 11(c).

25. The Court finds that Hallaq filed the defamation lawsuit in an attempt to protect his professional reputation from false accusations, not because Gunns filed the DOL complaint on October 10, 2008.

26. In December 2008, DOL notified Hallaq and CGR that it deemed Gunns' DOL complaint, including the supplemental claim against Hallaq arising out of the defamation lawsuit, as including a complaint under OSHA, section 11(c).  See 29 C.F.R. § 24.103(e).

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 12

27.     In March 2010, DOL filed the present lawsuit against the defendants alleging that they violated OSHA section 11(c) when (1) CGR terminated Gunns' employment; and (2) Hallaq filed the defamation lawsuit against Gunns.

## II.     CONCLUSIONS OF LAW

1.      This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 660(c)(2) and 28 U.S.C. § 1345.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

3.      Plaintiff's claim arises under OSHA's whistleblower protection provision, section 11(c), which provides as follows:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

4.       To prevail on its whistleblower protection claim under OSHA, plaintiff must prove:  (1) Gunns participated in a protected activity; (2) subsequent adverse action by the employer or other person; and (3) a causal connection between the protected activity and the subsequent adverse action.  <u>Schweiss v. Chrysler Motors Corp.</u>, 987 F.2d 548, 549 (8th Cir. 1993).

5.      A complaint is "protected" under section 11(c) if it arises under or is related to a health or safety hazard.  29 C.F.R. § 1977.9.  A complaint made to an employer only arises under section 11(c) if it is made in good faith.  <u>Id.</u> at § 1977.9(c).

6.      The plaintiff can establish a causal connection between the protected activity and the subsequent adverse action if the protected activity was a substantial reason for the adverse employment action.  29 C.F.R. § 1977.6; cf. Kimbro v. Atlantic Richfield Co., 889 F.2d 869, 881 (9th Cir. 1989) (holding that under ERISA's anti-retaliation provision, the evidence establishing a causal connection is sufficient if one could reasonably infer that the adverse action was in response to the protected activity); Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (holding in Title VII action that "[t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.").

7.      The Court concludes that Gunns' email of August 7, 2008 (Ex. A-17) does not constitute protected activity under section 11(c) because it was sent in bad faith.  Moreover, although both Hallaq and Gossing were very upset about the email, they were upset by Gunns' bad faith attempt to deflect responsibility for his failings as general manager, not because he reported any legitimate safety concerns.  Accordingly, plaintiff has failed to establish a prima facie violation of section 11(c) relating to the August 7, 2008 email.

8.      Even if the August 7, 2008 email constituted a protected activity and plaintiff had made a prima facie showing of retaliation, "[a]n employee's participation in activities protected by [OSHA] does not automatically render him immune from discharge or discipline for legitimate reasons, or from adverse action dictated by non-

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 14

prohibited considerations." 29 C.F.R. § 1977.6(a). Instead, where the plaintiff has made a prima facie showing of retaliation under section 11(c), the burden shifts to the employer to establish by a preponderance of the evidence that it would have reached the same decision in the absence of the protected activity. Marshall v. Commonwealth Aquarium, 469 F. Supp. 690, 692 (D. Mass. 1979); Schweiss, 987 F.2d at 549 (holding that once the plaintiff has met its burden to show a violation of section 11(c), the burden then shifts to the defendant to establish "a legitimate non-discriminatory reason for its actions."); see also Mackowiak v. Univ. Nuclear Sys., 735 F.2d 1159, 1164 (9th Cir. 1984) (applying burden shifting approach to mixed-motive cases arising under the Energy Reorganization Act). Thus, if the employer can show that the adverse action would have taken place even if the employee had not engaged in the protected activity, plaintiff cannot show a violation of section 11(c). See 29 C.F.R. § 1977.6(b) ("[I]f the discharge or other adverse action would not have taken place 'but for' engagement in protected activity, section 11(c) has been violated."). The defendant's non-discriminatory reason is not sufficient to avoid liability if the plaintiff shows that "the proferred reason is pretextual [for unlawful discrimination.]" Schweiss, 987 F.2d at 549.

        9.      The Court concludes that even if plaintiff had made a prima facie showing of retaliation under section 11(c), defendants have met their burden to show, by a preponderance of the evidence, that they would have terminated Gunns' employment even if he had not sent the email on August 7, 2008. Hallaq and Gossing

had become increasingly dissatisfied with Gunns' performance over the course of 2008. They had interviewed possible replacements, voiced their complaints to third parties, and had several heated confrontations with Gunns. Then, after Gunns sent the email in August 2008, he left Hallaq and Gossing to deal with the aftermath. See, e.g., Exs. A-33 and A-36. When he was present, Gunns continued to perform poorly. See A-35. The Court is persuaded that the evidence offered at trial related to Gunns' job performance was not a pretext for unlawful retaliation. Gunns' email on August 7, 2008, was not the but-for cause of his subsequent termination on September 22, 2008, and as such, plaintiff has failed to prove a violation of section 11(c) arising out of the termination. 29 C.F.R. § 1977.6(b).

    10. At the time Hallaq filed the defamation lawsuit in October 2008, he was aware only that Gunns had filed a complaint under environmental whistleblower protection laws. It was not until December 2008 that the plaintiff exercised its authority to deem Gunns' October 8, 2008 complaint as including a claim under OSHA section 11(c). Accordingly, the Court concludes that the defamation suit filed by Hallaq was not an attempt to retaliate against Gunns for filing an 11(c) complaint, or for engaging in activities protected by OSHA. Cf. Chao v. Norse Dairy Sys., 2007 WL 2838958 at *10-*13 (S.D. Ohio 2007).

    11. In addition, in other contexts, courts have held that "suits initiated in state court in good faith and as an attempt to rehabilitate the employer's reputation

which may have been tarnished by [an employee's protected complaint] are not necessarily violations" of anti-retaliation laws.  EEOC v. Levi Strauss & Co., 515 F. Supp. 640, 644 (N.D. Ill. 1981); see also EEOC v. Seelye-Wright of South Haven, Inc., 2006 WL 2884464, *4 (W.D. Mich. 2006) (holding that plaintiff must show that the defendant had no good faith basis for filing the state court lawsuit).  The Court concludes that Hallaq's defamation lawsuit was brought in good faith, in an effort to protect Hallaq's professional reputation as an attorney.  The complaint in the defamation lawsuit was limited to a single paragraph in Gunns' DOL complaint, and acknowledged Gunns' right to engage in protected activities.  As such, the lawsuit was not brought to retaliate against Gunns for his participation in protected activities, and the Court concludes that plaintiff has failed to establish that Hallaq's filing of the lawsuit against Gunns violated OSHA section 11(c).

      12.     Plaintiff has failed to meet its burden of proof on either of its retaliation claims against defendants CGR and Hallaq.  As such, plaintiff's claims are DISMISSED with prejudice.

      13.     To the extent any of the foregoing Findings of Fact contain or constitute Conclusions of Law, the Court reaches the stated legal conclusion.  To the extent any of the Conclusions of Law constitute Findings of Fact, the Court finds the facts in accordance with the legal conclusions stated.

      14.     The Clerk shall enter judgment in favor of defendants in accordance with these Findings and Conclusions, with costs awarded to the defendants.

DATED this 30th day of March, 2011.

_____
Thomas S. Zilly
United States District Judge

FINDINGS OF FACT AND CONCLUSIONS
OF LAW - 18